UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| CYNTHIA JOHN,<br><br>Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN, Acting Commissioner of Social Security,<br><br>Defendant. | NO: CV-13-3049-FVS<br><br>ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |

Before the Court are cross-motions for summary judgment, ECF Nos. 14, 15. The Court has reviewed the motions, the memoranda in support, the Plaintiff's reply memorandum, and the administrative record.

**JURISDICTION**

Plaintiff Cynthia John filed an application for Supplemental Security Income benefits on October 22, 2008. (Tr. 25.) Plaintiff alleged an onset date of May 2, 1985. (Tr. 198.) Benefits were denied initially and on reconsideration. On February 17, 2010, Plaintiff timely requested a hearing before an administrative

law judge ("ALJ"). (Tr. 111.) A hearing was held before ALJ Gene Duncan on June 9, 2011. (Tr. 40-100.) At that hearing, testimony was heard from Lloyd Meadow, PhD, a psychological expert, and the claimant. (Tr. 41.) The Plaintiff was represented by attorney Chad Hatfield at the hearing. (Tr. 40.) On September 14, 2011, the ALJ issued a decision finding Plaintiff not disabled. (Tr. 25-35.) The Appeals Council denied review. (Tr. 1-4.) This matter is properly before this Court under 42 U.S.C. § 405(g).

## STATEMENT OF THE CASE

The facts of this case are set forth in the administrative hearing transcripts and record and will only be summarized here. The Plaintiff was twenty-three years old when she applied for benefits and was twenty-six years old when the ALJ issued the decision. The Plaintiff currently is unemployed, is supported through the Washington State Department of Social and Health Services, and lives in an apartment with her uncle and her son. (Tr. 43.) The Plaintiff has only ever had one job, and it did not last. (Tr. 47.) The Plaintiff describes being unable to find work due to vision complications from her glaucoma and due to her low IQ.

## STANDARD OF REVIEW

Congress has provided a limited scope of judicial review of a Commissioner's decision. 42 U.S.C. § 405(g). A court must uphold the Commissioner's decision, made through an ALJ, when the determination is not

based on legal error and is supported by substantial evidence. *See Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985) (citing 42 U.S.C. § 405(g)). "The [Commissioner's] determination that a claimant is not disabled will be upheld if the findings of fact are supported by substantial evidence." *Delgado v. Heckler*, 722 F.2d 570, 572 (9th Cir. 1983) (citing 42 U.S.C. § 405(g)). Substantial evidence is more than a mere scintilla, *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975), but less than a preponderance. *McCallister v. Sullivan*, 888 F.2d 599, 601-02 (9th Cir. 1989) (citing *Desrosiers v. Secretary of Health and Human Services*, 846 F.2d 573, 576 (9th Cir. 1988)). Substantial evidence "means such evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citations omitted). "[S]uch inferences and conclusions as the [Commissioner] may reasonably draw from the evidence" will also be upheld. *Mark v. Celebrezze*, 348 F.2d 289, 293 (9th Cir. 1965). On review, the court considers the record as a whole, not just the evidence supporting the decisions of the Commissioner. *Weetman v. Sullivan*, 877 F.2d 20, 22 (9th Cir. 1989) (quoting *Kornock v. Harris*, 648 F.2d 525, 526 (9th Cir. 1980)).

It is the role of the trier of fact, not this court, to resolve conflicts in evidence. *Richardson*, 402 U.S. at 400. If evidence supports more than one rational interpretation, the court may not substitute its judgment for that of the

Commissioner. *Tackett*, 180 F.3d at 1097; *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984). Nevertheless, a decision supported by substantial evidence will still be set aside if the proper legal standards were not applied in weighing the evidence and making a decision. *Brawner v. Sec'y of Health and Human Services*, 839 F.2d 432, 433 (9th Cir. 1988). Thus, if there is substantial evidence to support the administrative findings, or if there is conflicting evidence that will support a finding of either disability or nondisability, the finding of the Commissioner is conclusive. *Sprague v. Bowen*, 812 F.2d 1226, 1229-30 (9th Cir. 1987).

**SEQUENTIAL PROCESS**

The Social Security Act (the "Act") defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Act also provides that a Plaintiff shall be determined to be under a disability only if his impairments are of such severity that Plaintiff is not only unable to do his previous work but cannot, considering Plaintiff's age, education and work experiences, engage in any other substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). Thus, the definition of disability consists of both

medical and vocational components. *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001).

The Commissioner has established a five-step sequential evaluation process for determining whether a claimant is disabled. 20 C.F.R. § 416.920. Step one determines if he or she is engaged in substantial gainful activities. If the claimant is engaged in substantial gainful activities, benefits are denied. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

If the claimant is not engaged in substantial gainful activities, the decision maker proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). If the claimant does not have a severe impairment or combination of impairments, the disability claim is denied.

If the impairment is severe, the evaluation proceeds to the third step, which compares the claimant's impairment with a number of listed impairments acknowledged by the Commissioner to be so severe as to preclude substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *see also* 20 C.F.R. § 404, Subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled.

If the impairment is not one conclusively presumed to be disabling, the evaluation proceeds to the fourth step, which determines whether the impairment

prevents the claimant from performing work he or she has performed in the past. If the plaintiff is able to perform his or her previous work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). At this step, the claimant's residual functional capacity ("RFC") assessment is considered.

If the claimant cannot perform this work, the fifth and final step in the process determines whether the claimant is able to perform other work in the national economy in view of his or her residual functional capacity and age, education and past work experience. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); *Bowen v. Yuckert*, 482 U.S. 137 (1987).

The initial burden of proof rests upon the claimant to establish a prima facie case of entitlement to disability benefits. *Rhinehart v. Finch*, 438 F.2d 920, 921 (9th Cir. 1971); *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999). The initial burden is met once the claimant establishes that a physical or mental impairment prevents him from engaging in his or her previous occupation. The burden then shifts, at step five, to the Commissioner to show that (1) the claimant can perform other substantial gainful activity, and (2) a "significant number of jobs exist in the national economy" which the claimant can perform. *Kail v. Heckler*, 722 F.2d 1496, 1498 (9th Cir. 1984).

**ALJ'S FINDINGS**

At step one of the five-step sequential evaluation process, the ALJ found that Plaintiff has not engaged in substantial gainful activity since October 22, 2008, the application date. (Tr. 27.) At step two, the ALJ found that Plaintiff had the medically determinable impairments of iritis and headaches. (Tr. 27.) However, the ALJ found that neither of the Plaintiff's impairments, alone or in combination, was severe. (Tr. 27-35.) Accordingly, the ALJ found that the Plaintiff was not under a disability for purposes of the Act. (Tr. 35.)

**ISSUES**

The Plaintiff argues that the ALJ's decision is not supported by substantial evidence or free of legal error because the ALJ erred in finding at step two that the Plaintiff was not under a disability.

**DISCUSSION**

To satisfy step two's requirement of a severe impairment, the claimant must prove the existence of a physical or mental impairment by providing medical evidence consisting of signs, symptoms, and laboratory findings; the claimant's own statement of symptoms alone will not suffice. 20 C.F.R. §§ 404.1508, 416.908; *Taylor v. Heckler*, 765 F.2d 872, 876 (9th Cir. 1985). The ALJ then determines whether the medically determinable impairment significantly limits her physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520(c);

416.920(c). The fact that a medically determinable condition exists does not automatically mean the symptoms are "severe," or "disabling" as defined by the Social Security regulations. *See e.g. Edlund*, 253 F.3d at 1159-60; *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989); *Key v. Heckler*, 754 F.2d 1545, 1549-50 (9th Cir. 1985).

An impairment may be found to be non-severe when "medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work." Social Security Ruling ("SSR") 85-28. Medical evidence alone is evaluated in assessing severity. *Id.* "The severity requirement cannot be satisfied when medical evidence shows that the person has the ability to perform basic work activities, as required in most jobs." *Id.* Basic work activities include: "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; seeing, hearing, speaking; understanding, carrying out and remembering simple instructions; responding appropriately to supervision, coworkers, and usual work situation." *Id.*

"[T]he step-two inquiry is a de minimis screening device to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996) (citing *Yuckert*, 482 U.S. at 153-54). An ALJ may find an impairment not severe "only if

the evidence establishes a slight abnormality that has 'no more than a minimal effect on an individual's ability to work.'" *Id.* (citing SSR 85-28).

The Plaintiff asserts that the ALJ erred in not finding that Ms. John suffered from the severe impairments of mental retardation and glaucoma.

**Mental Impairments**

Ms. John alleges that she suffers from mental retardation. Ms. John has been examined by three psychological experts and a fourth psychological expert reviewed her medical records and testified at the June 9, 2011, hearing.

The first examining psychologist was Arch Bradley, M.Ed., who examined Ms. John on September 11, 2008. Dr. Bradley relied on the Wechsler Adult Intelligence Scale III, the Woodcock Johnson III Tests of Achievement, and a structured interview. (Tr. 262.) Dr. Bradley identified Ms. John as having a deficient IQ, with a Wechsler Adult Intelligence Scale III full scale IQ score of 48. (Tr. 262.) He diagnosed her as suffering between moderate and mild mental retardation. (Tr. 264-65.) He found Ms. John's prospects for employment very limited as a result of her low IQ. (Tr. 264-65.)

On June 17, 2009, Ms. John was evaluated by Jay M. Toews, Ed.D. (Tr. 278.) Dr. Toews reviewed Dr. Bradley's earlier opinion. (Tr. 278.) Dr. Toews also performed a psychodiagnostic interview and mental status assessment on Ms. John. (Tr. 278, 279-80.) Included in his mental status assessment were the

Structured Inventory of Malingered Symptomology ("SIMS"), the mini-mental state examination ("MMSE") questionnaire, and the fifteen-figures test. (Tr. 279-80.) Dr. Toews found Ms. John's answers and performances during his examination to be suspicious. (Tr. 280.) He found her performance on the Mini-Mental Status Exam inconsistent with the IQ identified by Dr. Bradley. (Tr. 280.) Dr. Toews found the results on the SIMS and fifteen-figures test suggestive of malingering. (Tr. 280.)

At the June 9, 2011, hearing, testimony was taken from Lloyd Meadow, Ph.D. Dr. Meadow reviewed the reports of Dr. Bradley and Dr. Toews. (Tr. 59.) Dr. Meadow testified that nothing about Dr. Bradley's report reason to question its validity. (Tr. 59.) Dr. Meadow found no evidence in Dr. Toews' report to support Dr. Toews' conclusion that Ms. John is not credible. (Tr. 66.) Dr. Meadow agreed with Dr. Bradley's report and disagreed with Dr. Toews' report. (Tr. 67.) Dr. Meadow took issue with Dr. Toews' skepticism over Ms. John's inability to count to ten and with Dr. Toews' opinion that Ms. John's difficulty reciting the days of the week was suspicious. (Tr. 69-70.) Dr. Meadow also relied on the fact that Dr. Toews "accepts the IQ score" as established by Dr. Bradley. (Tr. 75.)

After the hearing on August 11, 2011, Ms. John was examined by Roland Dougherty, Ph.D. Dr. Dougherty performed the Wechsler Adult Intelligence Scale – IV, the Wechsler Memory Scale-III, and the Test of Memory Malingering

("TOMM") on Ms. John. (Tr. 463.) Dr. Dougherty noted poor effort on the tests and questioned the tests' validity. (Tr. 463.) Dr. Dougherty found a similar intelligence score on the Wechsler Adult Intelligence Scale as found by Dr. Bradley. (Tr. 463.) However, Dr. Dougherty noted that Ms. John's scores on the TOMM and Wechsler Memory Scale tests suggested malingering. (Tr. 463-64.) Dr. Dougherty also noted a contrast between Ms. John's demeanor and behavior during his mental status examination and the alleged deficiencies in her intellect. (Tr. 464.) Ultimately, Dr. Dougherty diagnosed Ms. John as malingering. (Tr. 466.)

In determining that Ms. John did not suffer from a severe mental impairment, ALJ Duncan preferred the opinions of Dr. Toews and Dr. Dougherty over the opinion of Dr. Bradley and testimony of Dr. Meadow. In evaluating a disability claim, the adjudicator must consider all medical evidence provided. A treating or examining physician's opinion is given more weight than that of a non-examining physician. *Benecke v. Barnhart*, 379 F.3d 587, 592 (9th Cir. 2004). If the treating physician's opinions are not contradicted, they can be rejected by the decision-maker only with clear and convincing reasons. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996). If contradicted, the ALJ may reject the opinion with specific, legitimate reasons that are supported by substantial evidence. *See Flaten v. Secretary of Health and Human Serv*., 44 F.3d 1453, 1463 (9th Cir. 1995).

With regard to Dr. Bradley's opinion, ALJ Duncan noted that Dr. Bradley himself questioned the validity of Ms. John's test scores, given that English was Ms. John's second language. (Tr. 34, 262.) Dr. Bradley also noted that beyond the test scores, Dr. Bradley relied heavily on the self-reporting of Ms. John. (Tr. 34.) An ALJ may discount a medical opinion where that opinion is based heavily on self-reports that are less than credible. *See Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009). Here, the ALJ found Ms. John not credible as to her symptom testimony. (Tr. 31.) That finding has not been challenged. Accordingly, Dr. Bradley's reliance on Ms. John's self-reporting can serve as a basis for discounting Dr. Bradley's opinion. ALJ Duncan also relied on the fact that two other examiners questioned the validity of Dr. Bradley's opinion. (Tr. 34.) Finally, ALJ Duncan noted that Ms. John's admitted abilities stand in contrast to the opinion of Dr. Bradley. (Tr. 34.) These bases are supported in the record and comprise specific and legitimate reasons for discounting the contradicted opinion of Dr. Bradley.

With regard to the testimony of Dr. Meadow, ALJ Duncan noted that Dr. Meadow relied very heavily on Dr. Bradley's assessment. (Tr. 33.) Dr. Meadow also gave his testimony without the benefit of Dr. Dougherty's report, which confirmed much of Dr. Toews' report. (Tr. 33.) ALJ Duncan noted that Dr. Meadow appeared to rely almost exclusively on the IQ score assessment of Dr.

Bradley without evaluating the actual level of Ms. John's functioning. (Tr. 33.) These reasons provide a substantial basis for rejecting Dr. Meadow's testimony.

With the testimony of Dr. Meadows and the opinion of Dr. Bradley discounted, the record provides no basis for a finding that Ms. John suffers a severe mental impairment. Instead, the medical evidence points to a diagnosis of malingering. As a result, the ALJ did not err in holding that Ms. John did not suffer a severe mental impairment.

**Glaucoma**

ALJ Duncan found that Ms. John suffered from a medical condition affecting her eyes but that none of the evidence in the record established that her vision was impacted beyond a minimal level. Ms. John argues that the ALJ erred by not finding that her visual limitations were severe.

Ms. John was seen by Richard P. Mills, M.D., on June 9, 2009. (Tr. 319.) At that time, Ms. John was suffering increased intraocular pressure. (Tr. 319.) She was prescribed eye drops to lower the pressure. (Tr. 319.) She was found to have visual acuity of 20/30 in her right eye and 20/100 in her left eye. (Tr. 319.) Visual field testing showed extremely constricted visual fields. (Tr. 319.) However, the visual field constriction was not consistent with the degree of damage noted in her eye. (Tr. 319-20.) Dr. Mills was "firmly optimistic" about Ms. John's visual acuity in her left eye. (Tr. 319-20.) Dr. Mills followed up with Ms. John on

March 11, 2010, where he noted that her condition appeared unchanged. (Tr. 350.) Dr. Mills informed Ms. John that she must vary the drops to meet her symptoms and recommended no changes. (Tr. 350.)

On August 27, 2010, Ms. John was examined by Barbara A. Smit, M.D., Ph.D. (Tr. 436.) Dr. Smit measured Ms. John's corrected visual acuity at 20/50 and 20/100. (Tr. 436.) Dr. Smit noted that Ms. John's iritis appeared to be "quiescent" and that her intraocular pressure appeared well controlled. (Tr. 436.) Dr. Smit noted that Ms. John appeared at her examination without her contacts or glasses. (Tr. 436.) Dr. Smit also noted that an attempt was made to measure Ms. John's visual field, but the test results were not consistent with Ms. John's physical condition. (Tr. 436.)

Ms. John was seen by Marvin G. Palmer, M.D., on July 15, 2011. Dr. Palmer diagnosed Ms. John as suffering from compound myopic astigmatism and primary open angel glaucoma in her right eye and compound myopic astigmatism and narrow angle glaucoma secondary to iritis in her left eye. (Tr. 451.) Dr. Palmer made a secondary diagnosis of bilateral amblyopia with constricted visual fields. (Tr. 451.) Dr. Palmer measured Ms. John's visual acuity as 20/50 in her right eye and 20/200 in her left eye without correction. (Tr. 450.) Dr. Palmer noted that Ms. John appeared at the examination without contacts or glasses. (Tr. 450.) Dr. Palmer also noted that "[w]ith Ms. John['s] constricted visual fields one

would consider her blind." (Tr. 451.) However, Dr. Palmer was also "unable to prove [Ms. John] has a functional problem." (Tr. 451.) Dr. Palmer also noted that Ms. John "is able to take care of her children and do household chores and live an independent life with her boyfriend." (Tr. 451.)

ALJ Duncan reviewed Ms. John's visual medical history and concluded that Ms. John's medical conditions were controlled with her current medication. (Tr. 29.) ALJ Duncan found no evidence of any more than a minimal limitation on Ms. John's ability to work. (Tr. 29, 30.) As ALJ Duncan noted, there are no examples in the record of Ms. John being functionally limited by her vision. Indeed, at two of her eye examinations, Ms. John appeared without the aid of contacts or glasses. (Tr. 436, 450.) Ms. John even explained that she did not use her prescribed contacts because they caused her pain. (Tr. 447.) Despite this, Ms. John has a record of being capable of caring for herself and her children independently, and Ms. John's medical providers have consistently noted that her prognosis is good. (Tr. 350-52, 436-37, 451.)

The one statement that stands in contrast to Ms. John's consistently positive diagnoses is Dr. Palmer's notes that "[w]ith Ms. John['s] constricted visual fields one would consider her blind" and that Ms. John's "lmited education and constricted visual fields will make her unemployable." (Tr. 451.) However, ALJ Duncan explicitly disregarded those statements because of the claimant's

questionable credibility and because a diagnosis of blindness contradicted Dr. Palmer's own opinion that Ms. John had no limitations. (Tr. 458.) Given the contradictions and Ms. John's lack of credibility, the Court finds that ALJ Duncan's decision to disregard Dr. Palmer's statements is supported by clear and convincing reasons. As the remaining evidence provides no basis to find more than a minimal limitation imposed by Ms. John's eye conditions, the Court finds that ALJ Duncan's decision is free of legal error and supported by substantial evidence.

**IT IS HEREBY ORDERED:**

1. The Plaintiff's motion for summary judgment, ECF No. 14, is DENIED.
2. The Defendant's motion for summary judgment, ECF No. 15, is GRANTED.
3. JUDGMENT shall be entered for the Defendant.

**IT IS SO ORDERED**.

The District Court Executive is hereby directed to enter this Order, to provide copies to counsel, and to close this file.

**DATED** this 29th day of January, 2014.

*s/Fred Van Sickle*
Fred Van Sickle
Senior United States District Judge